# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

(1)  **ROBERT DRAPER;**

(2)  **ARIEL WEISBERG;**

(3)  **DONNA MAJOR;**

(4)  **ERIC NOTKIN;**

(5)  **ROBERT BOUDRIE;**

(6)  **BRENT CARLTON,**

> *collectively, the*
> **"CONSUMER PLAINTIFFS"**, *and*

(7)  **CONCORD ARMORY, LLC;**

(8)  **PRECISION POINT FIREARMS, LLC;**

> *collectively, the*
> **"DEALER PLAINTIFFS"**, *and*

(9)  **SECOND AMENDMENT FOUNDATION, INC.,**

(10) **COMMONWEALTH SECOND AMENDMENT, INC.**

> *collectively, the*
> **"ORGANIZATIONS"**, *and*

Plaintiffs

v.

**MARTHA COAKLEY,**
> *in her official capacity as*
> **ATTORNEY GENERAL OF MASSACHUSETTS**

Defendant

Civil Action No.
1:14-CV-12471-NMG

# PLAINTIFFS' OPPOSITION TO THE DEFENDANT ATTORNEY GENERAL'S MOTION TO DISMISS

# **<u>Table of Contents</u>**

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ........................................................................................................................... 3

    I.    Legal Standard for a Motion to Dismiss ............................................................. 3

    II.    Standing ............................................................................................................... 3

        A.    Both SAF and COMM2A Have Organizational Standing
            on Behalf of Themselves and their Members....................................... 4

        B.    The DEALERS' Standing ...................................................................... 6

        C.    The CONSUMERS' Standing and Implication of the
            Second Amendment............................................................................. 10

    III.    Vagueness........................................................................................................... 12

        A.    The REGULATION is Facially Void for Vagueness
            on Behalf of Themselves and their Members..................................... 12

        B.    The REGULATION is Void As Applied to Glock Pistols .................. 17

    IV.    <u>Pullman</u> Abstention ......................................................................................... 12

CONCLUSION ..................................................................................................................... 25

# INTRODUCTION AND SUMMARY OF ARGUMENT

Faced with a challenge to 16 years of license to trample on Massachusetts firearms dealers' right to due process and Massachusetts citizens' fundamental Second Amendment right to acquire firearms in common use, the defendant ATTORNEY GENERAL's Motion to Dismiss—a collection of straw man arguments, misapplied or wholly irrelevant authorities, and tangle of circular reasoning—distracts from the single question at issue in this lawsuit:

> ***Do the words "device which plainly indicates", as they are used to define the "load indicator" alternative design requirement for semi-automatic pistols sold and/or transferred to Massachusetts consumers, provide Massachusetts licensed firearms dealers reasonable notice of what is required to comply with the "load indicator" alternative design requirement?***

The ATTORNEY GENERAL's arguments in her Motion to Dismiss are unavailing to answer the foregoing basic question of regulatory interpretation.  Instead she argues (emphasis in italics):

- Neither the DEALERS *who are subject to the REGULATION*, nor the CONSUMERS *who cannot purchase firearms in common use because of the REGULATION*, nor the ORGANIZATIONS who represent many of their members and supporters in the *identical circumstances as the DEALERS and CONSUMERS with respect to the REGULATION*, have standing to challenge the REGULATION.

    o The defendant ATTORNEY GENERAL's argument would have this Court come to the absurd conclusion that *no one has standing to challenge the REGULATION.*

- Though it is the *sole* reason for the CONSUMERS' *inability to acquire firearms in common use*, e.g. Gen3/4 Glock pistols, the REGULATION does not and cannot infringe on and/or burden their Second Amendment right because it applies only to the DEALERS' *commercial* activities (i.e. sale and transfer of firearms).

    o The defendant ATTORNEY GENERAL speciously severs cause from its direct *impact/effect* by ignoring the *reality* that for every inhibited sale is a corresponding inhibited purchase.

- Each of the challenged words in the REGULATION's definition of "load indicator" has a plain meaning and even several synonyms.  Thus, argues the defendant ATTORNEY GENERAL, it is impossible for the DEALERS to *not* understand the definition of "load indicator".

    o Nowhere in the REGULATION nor in the statute (the Massachusetts Consumer Protection Act) which it implements, nor anywhere in all of the Massachusetts General Laws, nor

anywhere in the entirety of the Code of Massachusetts Regulation, is there any context or limiting construction for the challenged words *as applied to firearms in general and to semi-automatic pistols in particular*.  Worse, the defendant ATTORNEY GENERAL refused and refuses to provide *any* guidance at all—even when specifically asked for clarification.

- The defendant ATTORNEY GENERAL claims that it is unnecessary for her to explain *how* and *why* she *decreed* that Gen3/4 Glock pistols do not comply with the REGULATION's definition of "load indicator".  But this is a moot point anyway, since the DEALERS actually knew/know that Gen3/4 Glock pistols do not comply with the REGULATION's definition of "load indicator" because the defendant ATTORNEY GENERAL *told them they do not, and that is enough*.

  o The defendant ATTORNEY GENERAL asks this Court to rubberstamp her administrative ukase that Gen3/4 Glock pistols are not REGULATION-compliant, without reference to any limiting construction, context, *text-based* interpretation, or standard of any kind.

- This Court "should [exercise <u>Pullman</u> abstention], absent compelling circumstances, in order to allow the *state agency* and the *state courts* first review of the interpretation of state *law* at issue and to avoid unnecessary constitutional adjudication."  Motion to Dismiss, p. 23.

  o <u>Pullman</u> abstention is inapplicable to a challenge of a state law on *parallel federal and state constitutional grounds*, which in this case is the 14th Amendment due process clause whose direct parallel is Article XII of the Massachusetts Constitution.  But that is not the issue here since the REGULATION implements Massachusetts state law which *by its own explicit terms* implements *federal* law.  Irrespective, were the Massachusetts state courts asked to interpret the REGULATION's definition of "load indicator" it is expected that the defendant ATTORNEY GENERAL would urge the state court to exercise <u>Auer</u> deference, to abstain from interpreting the unconstitutionally vague REGULATION and defer its interpretation back to the same defendant ATTORNEY GENERAL who insists that it is clear as is, argues that she is not required to interpret it and refuses to render any interpretation (if that were possible) even now.  But that, too, would be a dead end as agencies are not entitled to <u>Auer</u> deference if the interpreted regulation is so vague as to invite arbitrariness or "post hoc rationalizations … seeking to defend past agency action against attack."

It is instructive to keep in mind while reading this Opposition that even after having been served with this lawsuit the defendant ATTORNEY GENERAL has *still not proffered any interpretation of what a "load indicator" must actually <u>be</u>*.  On the contrary, she continues to insist that Gen3/4 Glock pistols do not comply with her mystery definition of "load indicator"—whatever it is—**_not by reference to any <u>standard</u>_** but by an impotent attempt to contrast them from her *interpretation* of **pictures** in the exhibits to the Complaint of virtually identical load indicators on pistols to which the defendant GENERAL has *not* objected.

# ARGUMENT

## I.   Legal Standard for a Motion to Dismiss

A complaint need not allege every fact necessary to win at trial, but need only include sufficient facts to make it "'plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678, (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, (2007)).  "In determining whether a complaint crosses the plausibility threshold, 'the reviewing court [must] draw on its judicial experience and common sense.'"  García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013) (quoting, Iqbal, 556 U.S. at 679).  "This context-specific inquiry does not demand 'a high degree of factual specificity.'"  Id. (quoting Grajales v. P.R. Ports Auth., 682 F.3d 40, 44 (1st Cir.2012)).  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted);  accord Bennett v. Spear, 520 U.S. 154, 168 (1997).  Even so, the complaint "must contain more than a rote recital of the elements of a cause of action."  Rodríguez-Reyes v. Molina- Rodríguez, 711 F.3d 49, 53, (1st Cir. 2013).

## II.   Standing

"Standing—a litigant's right to be in the courtroom—must be established in every case, as the Constitution permits the federal courts to address only 'actual cases and controversies.'"  Wilson v. HSBC Mortg. Services, Inc., 744 F. 3d 1, 8 (1st Cir. 2014), citing Culhane v. Aurora Loan Servs. of Neb., 708 F.3d 282, 289 (1st Cir. 2013).  Standing is a prerequisite for Article III jurisdiction, and thus must be determined before addressing the merits of a case.  Sutliffe v. Epping Sch. Dist., 584 F.3d 314, 325 (1st Cir. 2009).  To establish standing, a plaintiff must "present an injury that is concrete, particularized, and actual or imminent;  fairly traceable to the defendant's challenged action;  and redressable by a favorable ruling."  Ramírez-Lebrón v. Int'l Shipping Agency, Inc., 593 F.3d 124, 130 (1st Cir. 2010), quoting Horne v. Flores, 557 U.S. 433, 129 (2009).  Where a court decides a Rule 12(b)(1) motion on the pleadings, it must "construe the Complaint liberally

and treat all well-pleaded facts as true[,] according the plaintiff the benefit of all reasonable inferences." Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995); accord Calderon-Serra v. Wilmington Trust Co., 715 F.3d 14, 17 (1st Cir. 2013).

## A.  Both SAF and COMM2A Have Organizational Standing on Behalf of Themselves and on Behalf of Their Members

The Defendant ATTORNEY GENERAL contends that the two entity plaintiffs, Second Amendment Foundation, Inc. (hereafter "SAF") and Commonwealth Second Amendment, Inc. (hereafter "COMM2A") do not have standing to maintain the current lawsuit because there is insufficient evidence that either ORGANIZATION has itself been personally injured by the REGULATION, and/or that any of the ORGANIZATIONS' respective members have been so injured.

"It is well-accepted in the standing context that organizations may have interests of their own, separate and apart from the interests of their members. See, e.g., Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79 (1982); NAACP v. Button, 371 U.S. 415, 428 (1963); 13A Wright & Miller, Federal Practice and Procedure §3531.9.5 (3rd ed. 2011) ('[A]n organization can assert standing to protect against injury to its own organizational interests,' separate and apart from an organization's ability to 'borrow ... the standing that could be established by individual members.')" Massachusetts Delivery Ass'n v. Coakley, 671 F.3d 33, n.7 (1st Cir. 2012).

Both SAF and COMM2A have standing to sue on behalf of themselves regarding the issues raised in this lawsuit. The Complaint explicitly states at ¶7.1, "SAF's purposes include education, research, publishing and legal action regarding the fundamental Constitutional right to the private ownership and possession of firearms." The attached Declaration of Mikolaj Tempski, SAF's general counsel [hereafter "Tempski Declaration"] outlines SAF's direct involvement in this lawsuit. SAF conducts research on state and federal firearms laws, including existing and proposed firearms laws and regulations in Massachusetts. Tempski Declaration at ¶4. Over the last several years, SAF has itself and in concert with the other organizational plaintiff herein (COMM2A), researched the specific REGULATION at issue in this lawsuit. Id., at ¶5. SAF expends funds to prosecute civil rights lawsuits involving the Second Amendment, and is funding the prosecution of this lawsuit which is

directly related to SAF's unambiguous mission statement, duly posted on its website:

> The Second Amendment Foundation (SAF) is dedicated to promoting a better understanding about our Constitutional heritage to privately own and possess firearms.  To that end, we carry on many educational and legal action programs designed to better inform the public about the gun control debate.

SAF has not itself attempted to purchase a Gen3/4 Glock pistol in Massachusetts.  It does, however, raffle firearms to its members every year, including at least one Glock pistol.  If the winner of the Glock pistol would be in Massachusetts, SAF would not be able to transfer the prize to the winner because of the REGULATION.

The Complaint likewise explicitly states at ¶7.2 that "COMM2A's purposes include educational programs and legal action regarding the fundamental Constitutional right to the private ownership and possession of firearms guaranteed by the Second Amendment."  The attached Declaration of Thomas Bolioli, COMM2A's director of operations, [hereafter "Bolioli Declaration"] outlines COMM2A's direct involvement in this lawsuit.  COMM2A conducts research on state and federal firearms laws, including existing and proposed firearms laws and regulations in Massachusetts.  Bolioli Declaration at ¶3.  Over the last several years, COMM2A has itself and in concert with SAF researched the specific REGULATION at issue in this lawsuit.  Id., at ¶9.  COMM2A expends funds to prosecute civil rights lawsuits involving the Second Amendment.  Id., at ¶10.  The constitutional law challenge of the instant lawsuit is directly related to COMM2A's unambiguous mission statement, which is posted on its website:

> Commonwealth Second Amendment (Comm2A) is a grassroots civil rights organization dedicated to promoting a better understanding of rights guaranteed by the Second Amendment to the United States Constitution.  Our activities include educational programs designed to promote a better understanding of Massachusetts and Federal firearms laws and rights as well as programs to defend and protect the civil rights of Massachusetts gun owners.

Besides each having standing to sue on behalf of themselves, both SAF and COMM2A have standing to sue on behalf of their members and supporters regarding the issues raised by this lawsuit.  In the context of an organization suing on behalf of its members, the organization must demonstrate "(1) at least one of its members would have standing to sue as an individual, (2) 'the interests at stake are germane to the organization's purpose,' and (3) individual members'

participation is not necessary to either the claim asserted or the relief requested." Animal Welfare Inst. v. Martin, 623 F.3d 19, 25 (1st Cir. 2010) quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181, (2000).

As of the date of this Opposition, SAF has 8,066 members and supporters in Massachusetts. Of these, 1,847 are current-year and lifetime paid members.   Tempski Declaration at ¶7. Approximately 40 to 70 SAF members have contacted SAF specifically regarding the REGULATION within the past year.  Id., at ¶8.  Many of these members have asked SAF to take legal action over the REGULATION because as Massachusetts firearms dealers they cannot determine which pistols (including specifically Gen3/4 Glock pistols) are/are not REGULATION-compliant due to the REGULATION's vagueness, or as Massachusetts residents who want to but cannot purchase Gen3/4 Glock pistols because of Massachusetts firearms dealers' reticence to subject themselves to enforcement actions by the defendant ATTORNEY GENERAL.  Id., at ¶9.

As of the date of this Opposition, COMM2A has 835 donors predominantly from Massachusetts.  Bolioli Declaration at ¶11.  Many of COMM2A's donors have contacted COMM2A specifically regarding the REGULATION within the past few years.  Many of these donors have asked COMM2A to take legal action specifically to challenge the constitutionality of the REGULATION because they are directly affected by it.  Id., at ¶12.  COMM2A has also spent considerable resources in efforts to educate attorneys admitted in the Commonwealth regarding the REGULATION challenged by this lawsuit.

Per ample recent authority in this Circuit regarding an organization's standing to sue for injury to its own organizational interests (i.e. Massachusetts Delivery Ass'n v. Coakley, *supra*), and an organization's standing to sue on behalf of its members (Animal Welfare Inst. v. Martin, *supra*), both SAF and COMM2A have standing to participate in this lawsuit.

## B.  The DEALERS' Standing

The ATTORNEY GENERAL's attack on the DEALERS' standing is *doubly* false:  (1) it sets up and knocks down a straw man argument by *misrepresenting the facts alleged and legal issues raised in the Complaint*, and (2) presents a false premise (that the REGULATION's definition of "load

indicator" is *not* unconstitutionally vague—the *sole* issue at the heart of the Complaint) as the basis for the spurious conclusion that the DEALERS could not have been confused by any alleged vagueness since the defendant ATTORNEY GENERAL informed them that Gen3/4 Glocks do not comply with the REGULATION.

The defendant ATTORNEY GENERAL rewrites the nature of the COMPLAINT's vagueness allegation—which she summarized *correctly* at p. 4 of her Motion to Dismiss "... [The DEALERS] 'cannot determine with any reasonable certainty whether Gen3 and/or Gen4 pistols *comply* with the REGULATION'..." (emphasis in italics)—into a non-existent claim that the complained-of vagueness in the REGULATION concerns its *application* to the DEALERS and to Gen3/4 Glock pistols.  The defendant ATTORNEY GENERAL builds her straw man argument as follows (specific emphasis in italicized text):

- "The dealers [ ] allege they are injured because they have eschewed selling Generations 3 and 4 Glocks due to their questions *over the applicability of the regulation*.  Compl. Exs. 15, 16." Motion to Dismiss, p. 4.

- "Here, however, there was no actual uncertainty about *how the regulation would apply to the dealers*." Id.

- "The Attorney General's Office is the relevant regulatory authority for Mass. Gen. Laws ch. 93A ... and its letters should therefore provide content to the regulation *as applied to the dealers*." Id.

- "The letters make clear that the regulation *applies to the Glocks* the dealers want to sell." Id.

- "[A]ny loss of sales would have flowed from the very clarity of the Attorney General's (negative) construction of the statute *as applied to Glock*." Id., p. 5.

- "The Supreme Court has emphasized that a litigant seeking to challenge a statue for vagueness must demonstrate that the statute is vague *as applied to his own conduct*..." Id.

But the DEALER PLAINTIFFS never questioned (1) *whether* the REGULATION *applies* to them, (2) *how* the REGULATION *applies* to them, (3) *whether* the REGULATION *applies* to Glock pistols or (4) *how* the REGULATION *applies* to Glock pistols.  There is not a hint in the Complaint that the DEALERS did not always *explicitly* acknowledge that the REGULATION applies to them:

> "The REGULATION at §16.01 defines a 'handgun-purveyor' [ ] as 'any person or entity that transfers handguns to a customer located within the Commonwealth of Massachusetts'" and "[p]ursuant to M.G.L. c.140 §§ 122, 123 and 124, a 'handgun-purveyor' is a Massachusetts licensed firearms dealer."  Complaint at ¶27, et seq.

Likewise, the Court will not find anything in the Complaint denying the PLAINTIFFS' express acknowledgement that the REGULATION applies to Glock pistols:[1]

> "Thus, to be offered for sale or transfer to Massachusetts consumers by handgun purveyors [ ] Glock handguns must comply with the design requirements of ... the Massachusetts Handgun Sales Regulation (the REGULATION)."  Complaint, ¶¶30, 37.

It is unnecessary to address the defendant ATTORNEY GENERAL's authorities in support of her reformulated non-existent straw man argument that the DEALERS cannot establish standing because "there was no actual uncertainty about how the regulation would apply to the dealers ... [and] ... to Glock pistols."  The PLAINTIFFS never made such allegations.

The defendant ATTORNEY GENERAL's second argument challenging the DEALERS' standing is that among the three constitutional requirements for standing, i.e. (1) injury in fact; (2) causation; and (3) redressibility (Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); accord Katz v. Pershing LLC, 672 F.3d 64, 71-72 (1st Cir. 2012), the DEALERS lack the elements of causation and injury.  She writes "[w]hether any purported lost sales were caused by the dealer-plaintiffs' alleged uncertainty is crucial" [Motion to Dismiss, p. 5], and then declares that even if the DEALERS really were uncertain as to whether Gen3/4 Glock pistols comply with the REGULATION, she eliminated any such uncertainty through her response letters to the DEALERS in which she wrote "[t]he handguns presently manufactured by Glock, Inc. [ ] are not in compliance with the Massachusetts Handgun Sales Regulations".  Complaint **Exhibits "23"** and **"24"**.

There are two problems with this fallacious reasoning.  First, the defendant ATTORNEY GENERAL conflates the Article III justiciability requirements of standing and mootness.  After establishing standing through a "personal stake" in the lawsuit at the commencement of an action,

---

[1]    The REGULATION at 940 CMR 16.05(4) states that the "load indicator" and/or magazine safety disconnect alternative design requirement "applies only to handguns that have a mechanism to load cartridges via a magazine."  The PLAINTIFFS expressly acknowledge that the REGULATION applies to *all* pistols—not just Glock pistols—since only pistols employ magazines as feeding devices.

"the doctrine of mootness measures whether the plaintiff's interest remains sufficient to justify continuing federal jurisdiction."   U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980). Mootness is aptly described as "the doctrine of standing set in a time frame.   Ramirez v. Sanchez Ramos, 438 F. 3d 92, 97 (1st Cir. 2006) quoting U.S. Parole Comm'n v. Geraghty, supra, at 397.   The defendant ATTORNEY GENERAL's conflation (and substitution, really) of standing with mootness is self-evident from her purported cure of any vagueness in the REGULATION through her response letters to the dealers (Complaint **Exhibits "23"** and **"24"**):

- "Because the Attorney General's Office informed the dealers, relating to the very circumstances at issue in their vagueness challenge, that *these Glock pistols in fact violated the regulation*, there is *no vagueness here* and *no injury* that may be attendant to it."  Motion to Dismiss, p. 5, emphasis in italics.

- "Moreover, materials attached to the Complaint note that dealer Precision Point was aware 'for years' that Generations 3 and 4 Glocks *violated the regulation*."  Id., p. 3-4.[2]

- "The Complaint makes clear that the dealers in fact knew that *sale of the relevant Glocks violated 16.05(3)*.  Compl. ¶ 70.1" because "The Attorney General's Office, in response to their inquiries, directly *informed them of this fact.*  Compl. Exs. 23, 24."  Id., p. 4.

The second problem with the defendant ATTORNEY GENERAL's contention that the DEALERS lack the justiciability elements of causation and injury is that she uses a *petitio principia* based syllogism to spuriously presume—*proclaim* rather—the answer to very question this lawsuit seeks to resolve, e.g. "there is no vagueness here and no injury that may be attendant to it" because "the Attorney General's Office *informed* the dealers ... that *these Glock pistols in fact violated the regulation*".   The sham logic leading to this false conclusion would require this Court to adopt the un-established premise that "*Glock pistols in fact violated the regulation*" as true because, just as the defendant ATTORNEY GENERAL applied this reasoning to the DEALERS, *she said so*.   It borders on absurd to conceive that those subject to the REGULATION do not have standing to challenge it.

---

[2]    The defendant ATTORNEY GENERAL misrepresented even this immediately verifiable statement by dealer plaintiff PRECISION POINT (Complaint **Exhibit "16"**).  *In context*, PRECISION POINT wrote to the defendant ATTORNEY GENERAL (with emphasis in italics):

> *[A]s far as I understand it*, Glocks do not comply with the [REGULATION]...  We have simply *'known'* for years that these third and fourth-generation Glock pistols do not comply with the [REGULATION]...  Would you please *clarify* whether my *perception* regarding the legality of Fourth general Glocks is correct?  ...  I have turned away substantial business because of our *belief* that later-generation Glocks cannot be sold or transferred into the Commonwealth.  It would be very helpful if you could *clarify* this issue.

## C.   The CONSUMERS' Standing and Implication
## Of the Second Amendment

The defendant ATTORNEY GENERAL conflates the CONSUMERS' *standing* to sue with (1) the argument that "the consumers fail to allege a cognizable Second Amendment injury" because "the regulation here does not impinge on any Second Amendment right," (Motion to Dismiss, p. 5) and (2) "even if it did, the regulation would withstand constitutional scrutiny…" Id., p. 16.

The defendant ATTORNEY GENERAL's second argument, another straw man fabricated from nonexistent claims she attributes to the PLAINTIFFS, may be dispensed with quickly:  the Complaint does not challenge the ATTORNEY GENERAL's authority to promulgate firearm-related regulations or that the REGULATION's "load indicator" requirement (*independent of its unconstitutionally vague definition*) is unconstitutional *per se*.  "Our review on a motion to dismiss is confined to the face of the complaint."  Decotiis v. Whittemore, 635 F. 3d 22, 33 (1st Cir. 2011).  Thus, whether a regulatory "load indicator" requirement is or is not closely or substantially related to an important or compelling government purpose, or what level of scrutiny should be applied to such a regulation, is not the subject of the Complaint and is irrelevant to the issues before this Court.  On the other hand what is relevant and what is the subject of this lawsuit is whether the REGULATION'S *definition* of "load indicator" meets constitutional scrutiny, i.e. it is not impermissibly vague or ambiguous.  The implication of the CONSUMERS' Second Amendment rights by the unconstitutional *definition* of "load indicator" is a jurisdictional issue.

Turning to the defendant ATTORNEY GENERAL's first argument, she refers to the landmark case of District of Columbia v. Heller, 554 U.S. 570 (2008) to argue that the "challenged regulation, requiring a handgun to contain a load indicator or magazine safety disconnect prior to sale [ ] qualifies as a presumptively valid law that 'impos[es] conditions … on the commercial sale of arms' and does not implicate the Second Amendment."   But this is a logical contortion attempting to swage the presumptive validity of regulations over the "commercial sale of arms" into the presumptive validity of the *implementation* and *impact* of such regulations.

If this Court were to adopt the defendant ATTORNEY GENERAL's approach, it would have to ignore reality, to wit, that on the opposite face of every firearm *sale* is a firearm *purchase*;  it is thus

literally impossible to separate the effect of the unconstitutionally vague REGULATION on the DEALERS' *sales* from its impact on the CONSUMERS' ability to *purchase* firearms.   "It is of no moment that the statute does not impose a complete prohibition.   The distinction between laws burdening and laws banning speech is but a matter of degree."   United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 812 (2000).   Although expressed in the context of a First Amendment claim, the principle that "laws burdening and laws banning [constitutionally protected conduct, i.e. the CONSUMERS' Second Amendment right] is but a matter of degree" is equally applicable here.

   Thus, the appropriate inquiry in this matter is:

> **"Does the REGULATION's unconstitutionally vague definition of load indicator make it more difficult or impossible for the CONSUMMERS to purchase firearms in common use (i.e. Gen3/4 Glock pistols)?"**

   The answer to this question is unequivocally "yes" and is painstakingly detailed in the Complaint and its supporting exhibits.   Glock pistols are firearms in "common use".   Complaint ¶34.   Each of the CONSUMERS sought to purchase a Gen3/4 Glock pistol from one or more of the DEALERS.   Complaint ¶¶ 39–44.   The DEALERS declined to sell the CONSUMERS Gen3/4 Glock pistols (Complaint ¶¶ 45–50) because they did not know whether these pistols comply with the REGULATION's "load indicator" alternative design requirement.   Complaint ¶¶ 51, 52.   Thus, the CONSUMERS were prevented from acquiring firearms "common use" because of the unconstitutionally vague REGULATION's chilling effect on the DEALERS' sales.   The CONSUMERS' injury is "(a) concrete and particularized;   and (b) actual or imminent, not conjectural or hypothetical."   Katz v. Pershing, LLC, 672 F. 3d 64, 71 (1st Cir. 2012).

   The effect of the REGULATION's unconstitutional vagueness on the DEALERS' commercial activity (sales of firearms) renders it impossible for the CONSUMERS to acquire those firearms.   In the instant lawsuit, those firearms happen to be Gen3/4 pistols, the most commonly purchased pistols in America.   Complaint ¶34.   The CONSUMERS established standing to sue in this matter based on the burden of the REGULATION's impact on their Second Amendment rights.

///

# III. <u>Vagueness</u>

PLAINTIFFS challenge the REGULATION's load indicator alternative design requirement both *facially* and *as applied* to them in particular.  A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case.  <u>City of Lakewood v. Plain Dealer Publ'g Co.</u>, 486 U.S. 750, 770 n. 11 (1988).  An as-applied attack, in contrast, does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right.  <u>Wis. Right to Life, Inc. v. FEC</u>, 546 U.S. 410, 411-12 (2006) (per curiam).  The REGULATION is unconstitutional from *both* the facial and as-applied perspectives.

## A.  The REGULATION is Facially Void for Vagueness

In <u>FCC v. Fox Television Stations</u>, 567 U.S. ___, 132 S.Ct. 2307 (2012) the Supreme Court summarized the axiomatic "void-for-vagueness" precept of due process, which requires that statutes and regulations be sufficiently clear and precise so that persons of ordinary intelligence subject to them can reasonably ascertain what conduct is required and/or what conduct is forbidden.  *More importantly, such clarity is necessary to set sufficient limits **on those tasked with their enforcement** from doing so capriciously or discriminatorily*:

> A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.  *See* <u>Connally v. General Constr. Co.</u>, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law");  <u>Papachristou v. Jacksonville</u>, 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972) ("Living under a rule of law entails various suppositions, one of which is that '[all persons] are entitled to be informed as to what the State commands or forbids;'" (quoting <u>Lanzetta v. New Jersey</u>, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939) (alteration in original))).  This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment.  *See* <u>United States v. Williams</u>, 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008).  It requires the invalidation of laws that are impermissibly vague....  ¶ *Even when speech is not at issue, the void for vagueness doctrine addresses at least two connected but discrete due process concerns:  first, that regulated parties should*

**know what is required of them so they may act accordingly;  second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way**.  *See* <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108-109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).  [Emphasis added in bolded italics.]

The REGULATION's definition of "load indicator" is *facially* void for vagueness under the due process clause of the Fourteenth Amendment because the DEALERS cannot (nor can *anyone*) determine under any circumstances with any reasonable degree of certainty whether Gen3/4 Glock pistols (or *any* of the pistols on the <u>Approved Firearms Roster</u>) comply with the REGULATION.

The REGULATION defines "load indicator" as "a device which plainly indicates that a cartridge is in the firing chamber within the handgun."  This hollow definition prescribes what this "device" (whatever it is) must *do*—"plainly indicate"—but does not specify or even suggest *how* this "device" must do that, i.e. visually, tactilely, or otherwise.  Nor does the REGULATION or its enabling statute (G.L. c.93A) provide any *standard* at all against which anyone, especially the defendant ATTORNEY GENERAL, can measure compliance with the amorphous words "plainly indicates".  Failing to explain how this "device" must actually *do* what it is supposed to do is but one of the REGULATION's defects.  Worse, it fails to explain what this mystery "device" thing must **be**.

"What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved;  but rather the indeterminacy of precisely **what** that fact is."  <u>U.S. v. Williams</u>, 553 U.S. 285, 306 (2008), emphasis in bolded italics.[3]  That is exactly the problem with the REGULATION's definition of "load indicator".

"Device" is such a broad term that it can mean almost anything including just "thing".  The defendant ATTORNEY GENERAL has not objected to a "load indicator" consisting of nothing more than a small hole at the base of a firing chamber which makes it possible to see (under certain conditions) the rim of a cartridge casing if one is present.  Nor has she objected to a protruding tab at the top of a slide to serve as a "load indicator".  She has not objected to an extractor-based "load indicator" that protrudes slightly from the slide when a cartridge is in the firing chamber (the mechanism employed by Glock pistols).  Searching the REGULATION and its enabling statute for

---

[3]     Though <u>U.S. v. Williams</u> involved a criminal statute, the principle of voiding a government mandate or prohibition for vagueness is directly applicable to regulations.  <u>FCC v. Fox Television Stations</u>, *supra*.

"precisely **what** that fact is" that transforms an ordinary thing into a REGULATION-compliant "device which plainly indicates" (<u>Williams</u>, *supra*, at 306) reveals that nothing requires that it be *built into to the pistol itself*. Thus, a sensitive weight scale could conceivably be supplied with a pistol to allow for the comparison of the pistol's weight with a cartridge in the firing chamber and its weight without a cartridge in the firing chamber. An indicating rod could be included with a pistol that when inserted into the barrel with a cartridge in the chamber would expose a colored region that would otherwise be concealed by the barrel if the chamber is empty.

The total lack of standards in the REGULATION's definition of "load indicator" creates the potential for absurd results, capricious and arbitrary enforcement. Looking down the barrel through the muzzle will visually reveal a loaded chamber more clearly than peering through a small hole at the base of the chamber (which the defendant ATTORNEY GENERAL has accepted as a valid "load indicator"). The reality is that *all semi-automatic pistols*, including Gen 3/4 Glock pistols, have "load indicators" built into them that is inherent in their designs—the slide. No firearm enthusiast would seriously argue that pulling the slide to the rear is not the most reliable (and many would ardently insist, *only*) way to determine whether there is a cartridge in the firing chamber.

The REGULATIONS' vague use of the word "device" to define "load indicator" is made all the more glaring when analyzed side-by-side with the unobjectionable use of the same word "device" in the REGULATION's definition of "magazine safety disconnect" in the same subsection. Section 16.05(1) defines a "magazine safety disconnect" as "a *device* that prevents the firing of the handgun when the magazine is detached from the handgun". [Emphasis in italics.] The clearly understandable *purpose* of this "device" shifts focus from what it must *be* to its unmistakable mission and purely binary *standard* by which its accomplishment can be measured. The "device" *either* prevents the firing of the handgun when the magazine is detached from the handgun *or* it does not. There is no grey area. A cartridge cannot be "a little" fired or "a lot" fired; it is either fired or it is not fired. *How* the magazine safety disconnect "device" accomplishes its mission, where it is located, what it actually is, its color, size, shape, dimensions, etc. are not germane to whether it accomplishes its *unambiguous* mission measured by an equally unambiguous *standard*.

Further, the REGULATION's use of the words "plainly indicates" in the definition of "load

indicator" is likewise hopelessly vague.  "Plainly indicates" can mean anything and one need not venture to extremes to conceive of a multitude of reasonable and simple interpretations.  The defendant ATTORNEY GENERAL herself offers a number of synonyms at p. 10 of her in her Motion to Dismiss.  "Indication" can be done visually and the adverb "plainly" can be from any range of distances and/or angles.  "Indication" can be done audibly and the adverb "plainly" can be any range of audible decibels and frequencies.  "Indication" can be done tactilely and the adverb "plainly" can be anything from feeling a slight projection with a bare fingertip to a sensation in the palm through a thick glove.  But there is *nothing whatsoever* in the REGULATION or its enabling statute to "indicate" to *anyone* "precisely *what* that fact is" [Id.] that qualifies as "plainly indicates".

The defendant ATTORNEY GENERAL argues that "the mere fact that a regulation requires interpretation does not make it vague" and that words like "device," "plainly," and "indicate" cannot form the basis for a claim of unconstitutional vagueness.  Motion to Dismiss, pp. 10-11.  To prove her point she lists the prevalence of the challenged words "indicate" and "device" in the both Massachusetts and Federal laws.  While interesting it does nothing to clarify the vagueness herein.

The defendant ATTORNEY GENERAL was specifically asked to clarify whether Gen3/4 Glock pistols comply with the REGULATION, and if not, *why* not.  Complaint, ¶¶53–60 and **Exhibits "15"– "22"** thereto.  The defendant ATTORNEY GENERAL responded with a boilerplate letter that Gen3/4 Glock pistols "are not in compliance with the [REGULATION] because they lack an effective load indicator or magazine safety disconnect."  Complaint, ¶¶61–64 and **Exhibits "23"–"30"** thereto. The defendant ATTORNEY GENERAL has not provided *any* interpretation of "load indicator" as of this date, more than three months after having been made explicitly aware by the Complaint of the nature of the PLAINTIFFS' allegations of unconstitutional vagueness.  So her claim that "the mere fact that a regulation requires interpretation does not make it vague" fails outright as moot because the defendant ATTORNEY GENERAL has not, and refuses, to provide *any* such interpretation.

"[W]e have struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent' – wholly *subjective* judgments *without statutory definitions, narrowing context, or settled legal meanings*."  Williams, 553 U.S. at 304, (internal citations omitted, emphasis in italics).  PLAINTIFFS are unaware of any statutory or regulatory definitions of the

words "device", "plainly" or "indicate" as no such definitions exist anywhere in the REGULATION or its enabling statute, Chapter 93A of the Massachusetts General Laws.  The Court will search far and wide in the Massachusetts General Laws and in the Code of Massachusetts regulation for *any* limiting construction for the words "device," "plainly," and "indicate" as they are used alone or in any combination in the "narrowing context" of firearms in general, semi-automatic firearms more particularly, and semi-automatic handguns specifically.  Nor will this Court find any regulatory or statutory definitions for these words used alone or in any combination.[4]

The defendant ATTORNEY GENERAL resorts to synonyms in an attempt to redeem her hopelessly vague definition of "load indicator".  But these synonyms do nothing to bring anyone closer to an understanding of *what* the REGULATION requires and *what* it forbids.  Williams, *supra*, at 306.  For example, substituting some the defendant ATTORNEY GENERAL's suggested synonyms yields the following alternative definitions for "device which plainly indicates":

- "A contrivance free from obstruction that serves as a symptom" that a cartridge is in the firing chamber within the handgun.

- "A mechanism that obviously signifies" that a cartridge is in the firing chamber within the handgun.

- "An apparatus that in a manner that makes it evident to the mind or senses points out with more or less exactness" that a cartridge is in the firing chamber within the handgun.

Contrast these incurable vagaries with the REGULATION's other wholly *understandable* words.  No one will argue that the words "cartridge", "firing chamber" and "handgun" are vague or ambiguous, especially as they are used in the *narrowing context of a firearm regulation*.  It is unlikely that anyone would think that the word "cartridge" as it is used here really means *printer* cartridge.  No one will argue that the words "is in" as they are used to connect "cartridge" and "firing chamber" mean anything other than "presently inside that portion of the barrel in which the

---

[4]    Another closely related stark example of a Massachusetts statutory definition deviating from the common knowledge, traditional and *common sense* meaning of an everyday word is the **absence** of a definition of "handgun" in the General Laws, though the word is used in three separate sections, including one that imposes felony criminal liability for its violation.  In fact, M.G.L. c140 §121 inexplicably substitutes the word "firearm" (an entire genre of arms, i.e. "edged weapons") for one of its members—"handguns"—while providing separate definitions for other members of the genre, e.g. rifles and shotguns.  This unique feature of Massachusetts law defies logic and common sense:  it is similar to substituting "fowl" for "chickens" while providing separate definitions for ducks and geese.

cartridge is inserted prior to being fired".  Going one step further, the preceding interpretation "presently inside that portion of the barrel…" is the *only* possible interpretation, because revolvers have multiple firing chambers which are *not* integral with the barrel, and per §16.05(4), subsection (3) "applies only to handguns that have a mechanism to load cartridges via a magazine"—pistols.

The defendant ATTORNEY GENERAL asserts that regulations concerning commercial activities need not be precise because "courts rightly expect that merchants in a regulated industry should have a higher level of sophistication regarding the subject matter of their wares, and that those merchants can be more readily expected to interpret the rules that govern their transactions." Motion to Dismiss, p. 12.  The PLAINTIFFS are unaware of any firearm industry, field or trade terms of art, jargon or colloquialisms for the words "device", "plainly" and "indicates".  Nor has the defendant ATTORNEY GENERAL, who advances this argument, provided any such references.

In sum, neither the REGULATION nor its enabling statute specify or even suggest what the load indicator "device" must *be* and *how* it is to accomplish its nebulous "plainly indicate" purpose. The REGULATION and its enabling statute are silent with respect to the standards against which compliance with what the "load indicator" must *be* and its accomplishment of what it must *do* can be measured.  The REGULATION does not provide *any* guidance whatsoever about *anything it requires*, nor can any such guidance be dragged out of its promulgator, the defendant ATTORNEY GENERAL.  The REGULATION'S definition of "load indicator" is clearly facially void for vagueness.

## B.  The REGULATION is Void As Applied to Glock Pistols

So what about Gen3/4 Glock pistols caused the defendant ATTORNEY GENERAL to decree that they do not comply with the REGULATION?  She generously provided the reason in her letters to the DEALERS [Complaint **Exhibits "23"** and **"24"**]:  Gen3/4 Glock pistols "are not in compliance with the [REGULATION] because they lack an effective load indicator or magazine safety disconnect."  Complaint, ¶¶61–64 and **Exhibits "23"–"30"** thereto.  Each of the defendant ATTORNEY GENERAL's response letters to the PLAINTIFFS is silent as to "precisely ***what*** that fact is" (Williams, *supra*, at 306) that makes the load indicators of Gen3/4 Glock pistols "not effective".

*How* the defendant ATTORNEY GENERAL came to the conclusion that Gen3/4 Glock pistols

"lack an effective load indicator" is critically important.  We gain an important insight into this from her Motion to Dismiss arguments:

- "*Pictures* of the Glock load indicator device shown in Complaint exhibits 42 and 43 do not show any discernible difference in the load indicator before the gun is loaded and after the gun is loaded, let alone an 'obvious' or 'evident' one."  Motion to Dismiss, p. 12.

- "These *manual excerpts* show guns with *colored indicators* that provide a *shading contrast* to demonstrate (1) the *location* of the load indicator and (2) that cartridges are in the firing chamber."[5]  Id., 14.

- On the other hand, the Glock device, *as seen in the Exhibits* to the Complaint, is *not colored* and does not provide such a *contrast*."  Id.

- "The extent of *protrusion*, the *shape*, the *size*, and the *exact placement* of the load indicator device also *appear from the exhibits* to differ between Glocks and those purportedly 'virtually identical' firearms."  Id.

Whether intentionally or inadvertently, for the first time in the 15 years that the REGULATION has been in place, the defendant ATTORNEY GENERAL provides a glimpse *not* into **what** is required to comply with the REGULATION's hopelessly vague definition of "load indicator" (Williams, *supra*, at 306), but what about Gen3/4 Glock pistols' load indicators she determined renders them "not effective".  Even more remarkably, rather than describe how she came to her conclusion through a "fair and considered judgment on the matter in question" [Auer v. Robbins, 519 U.S. 452, 462 (1997)], the defendant ATTORNEY GENERAL candidly revealed the extent of her analysis:  pointing out the differences in the "[*p*]ictures of the Glock load indicator device shown in Complaint exhibits 42 and 43", "*manual excerpts* [Complaint exhibits 39-41]", and "*appear[ance] from the exhibits… [Compare* Exs. 39-41 with Exs. 42, 43]."

Even "post hoc rationalization" cannot rescue the defendant ATTORNEY GENERAL's capricious decree that Gen3/4 Glock load indicators are "not effective".  Neither the REGULATION nor its enabling statute specifies or even *suggests* **what** the load indicator must *be*, i.e. a button, tab, notch, hole, projection, etc.  Williams, *supra*, at 306.  Neither the REGULATION nor its enabling

---

[5]    "… that cartridges [plural] are in the firing chamber" is a physical impossibility, as firing chambers can accommodate only one cartridge at a time.  If by "cartridges [plural]" the defendant ATTORNEY GENERAL meant a *double feed malfunction*, then no load indicator would be necessary to determine that condition as the slide of the pistol would remain to the rear, prevented from sliding back into battery by the second cartridge lodged behind the one in the firing chamber.

statute specifies or even *suggests* what the minimum, maximum or range of **sizes**, **dimensions**, **colors**, **shapes**, etc. the load indicator must **be**.  Id.  Nor is it specified or even *suggested* **where** on the pistol the load indicator must be located, i.e. on the frame, grip, slide, trigger, at the breach, at the muzzle, on right or left side or on both sides of the pistol, etc.  Id.  In short, the REGULATION is incurably vague not only with what the "load indicator" must **do**, but what it must **be** and **how** it is to do it.  There is just no way the defendant ATTORNEY GENERAL could have decreed that Gen3/4 Glock pistols do not comply with the REGULATION without doing so capriciously and arbitrarily.

> We have never applied the principle of [Chevron deference[6]) to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice.   To the contrary, we have declined to give deference to an agency counsel's interpretation of a statute where the agency itself has articulated no position on the question...  Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.

Bowen v. Georgetown Univ. Hospital, 488 U.S. 204, 212-213 (1988).  It is obvious that the defendant ATTORNEY GENERAL's explanation of how Glock pistols do not comply with the vague definition of "load indicator", *for the first time ever*, and by reference to pictures and manual excerpts in the Complaint's exhibits, is precisely the "'post hoc rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack" that the Supreme Court warned about in Auer v. Robbins, *supra*, 462.  The defendant ATTORNEY GENERAL has not provided anything whatsoever in her Motion to Dismiss to defeat the PLAINTIFFS' as-applied challenge as it concerns Glock pistols.

Finally, even *arguendo* there was some conceivable way to give the words "device which plainly indicates" some limiting construction, all such hope was vanquished by the defendant ATTORNEY GENERAL in singling out Gen3/4 Glock pistols' load indicators as "not effective". Inferring from her *not* having similarly construed as "not effective" the virtually identical extractor-based load indicators of Kahr Arms pistols (Complaint ¶69.3.A., **Exhibit "39"**), Heckler & Koch USP and P-series of pistols (Complaint ¶69.3.B., **Exhibit "40"**) and Beretta 92-series of pistols (Complaint ¶69.3.C., **Exhibit "41"**), the DEALERS reasonably believed that the virtually identical extractor-based load indicators on Gen3/4 Glock pistols are likewise REGULATION-complaint.  The

---

[6]   Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837, 842-844 (1984).

defendant ATTORNEY GENERAL's removal of Glock pistols from the compliant category for wholly unexplained reasons confounds any possibility of ever knowing how *any* pistol can comply with the "load indicator" alternative design requirement, other than maybe through clairvoyance.

# IV.  **Pullman Abstention**

The defendant ATTORNEY GENERAL urges that "[i]f the Court determines that the meaning of 16.05(3) remains uncertain" it should exercise Pullman Abstention to "allow Massachusetts courts a full opportunity to interpret the regulation" because "if Massachusetts courts could offer an interpretation of 940 Mass. Code Regs. 16.05(3) that would render the constitutional issues moot."

Pullman abstention, implicated when a federal court is confronted with an allegation that a state law violates federal rights, "'is warranted where (1) *substantial* uncertainty exists over the meaning of the state *law* in question, and (2) settling the question of state *law* will or may well obviate the need to resolve a significant federal constitutional question.'" Barr v. Galvin, 626 F. 3d 99, 107-108 (1st Cir. 2010), quoting Batterman v. Leahy, 544 F.3d 370, 373 (1st Cir. 2008) (emphasis in italics).  "Pullman recognizes the importance of state sovereignty by limiting federal judicial intervention in state affairs to cases where intervention is necessary.  If an open question of state-law would resolve a dispute, then federal courts may wait for the resolution of the state-law issue before adjudicating the merits." Virginia Office for Protection and Advocacy v. Stewart, 563 U.S. __, __, 131 S. Ct. 1632, 1644 (2011) (Kennedy, J., concurring)).

"Abstention is, of course, the exception and not the rule…" Houston v. Hill, 482 U.S. 451 (1987) cf., Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813 (1976). Abstention is "an *extraordinary and narrow exception* to the duty of the District Court to adjudicate a controversy properly before it." Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 728 (1996) (internal citations omitted, emphasis in italics).  "Concurrent federal-state jurisdiction over the same controversy does not generally lessen the federal courts' 'virtually unflagging obligation … to exercise the jurisdiction given them.'" Jimenez v. Rodriguez Pagan, 597 F. 3d 18, 27 (1st Cir. 2010), quoting Colo. River, 424 U.S. at 817.

There are several important reasons, each of which by itself is enough, to militate against

the application of <u>Pullman</u> abstention in this case.  Indeed, just two years ago this very Court was urged to exercise <u>Pullman</u> abstention in a lawsuit challenging a state law as violating the Equal Protection Clauses of the United States Constitution and the Massachusetts Declaration of Rights. <u>KG Urban Enterprises, LLC. v. Patrick</u>, 839 F. Supp. 2d 388 (D. Mass. 2012).  This Court declared that challenges of state laws based on violations of corollary federal and state constitutional protections

> "… do not require abstention because they implicate parallel equal protection provisions of the Massachusetts and United States constitutions.  <u>Guiney v. Roache</u>, 833 F.2d 1079, 1082-83 (1st Cir. 1987) ('[W]here state and federal constitutional provisions are parallel, the state provision is unlikely to be any more ambiguous than the federal provision, and abstention is unnecessary.')"  <u>Id.</u>, at 399.

The PLAINTIFFS in this matter allege that the REGULATION violates the DEALERS' 14th Amendment right to due process.  Like its federal corollary, Article XII of the Massachusetts Constitution provides "And no subject shall be … deprived of his property, immunities, or privileges … or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land." To be sure, "…the due process provisions of the Massachusetts Constitution [ ] afford protection comparable to that supplied by the Fourteenth Amendment, *especially in the cases of economic regulation*…" <u>Boston v. Keene Corp.</u>, 406 Mass. 301, 308 n. 8 (1989) (emphasis in italics).

There is more.  "The Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, authorizes the Attorney General to promulgate regulations defining unfair and deceptive practices by entities in trade or commerce.  Mass. Gen. Laws ch. 93A, § 2(c)."  Motion to Dismiss, p. 2.  But M.G.L. ch.93A, § 2(b) provides that (emphasized in italics) "It is the intent of the legislature that in construing paragraph (a) of this section … the courts will be guided by the interpretations given by the *Federal* Trade Commission and the *Federal* Courts to section 5(a)(1) of the *Federal* Trade Commission Act (15 U.S.C. § 45(a)(1))" which proscribes "unfair or deceptive acts or practices in or affecting commerce."  Thus, the REGULATION at issue in this lawsuit is the direct *implementation of federal law*;  Massachusetts' direct implementation of federal law renders unnecessary the need to resort to *parallel* state and federal constitutional provisions to reject <u>Pullman</u> abstention herein.

Further, a federal court confronted with a motion to abstain must consider whether the transferee forum will adequately protect the rights of the party seeking to invoke federal

jurisdiction.  U.S. v. Fairway Capital Corp., 483 F. 3d 34, 43-44 (1st Cir. 2007) (internal citations omitted).   The mere "*possibility* that the state court proceeding *might* adequately protect the interests of the parties is not enough to justify the district court's deference to the state action."  Id., (internal citations omitted) (emphasis in italics).  The adequacy of another forum is "important only when it *disfavors* abstention."  Id., emphasis in italics.

The defendant ATTORNEY GENERAL plays fast and loose with her ever-alternating use of the words "law", "statute" and "regulation" in referring to the REGULATION and casually argues for the exercise of Pullman abstention because of "substantial uncertainty over the meaning of the state *law* in question and settling the state *law* question may obviate the need to resolve a significant federal constitutional question…"  Motion to Dismiss, p. 22 (emphasized in italics).  Her Motion to Dismiss is peppered with the words "law" and "statute" referring to the REGULATION's "load indicator" alternative design requirement.  These are just a few examples:

- "[A]ny loss of sales would have flowed from the very clarity of the Attorney General's (negative) construction of the *statute* as applied to Glock."  Motion to Dismiss, p. 5.

- "Loss of sales may provide standing for a state-*law* claim (albeit meritless) that the Office of the Attorney General's interpretation violates the *regulation*…"  Id.

- "The dealers may well have lost sales due to an inability to sell weapons under the *law*, but again they did not sue seeking a ruling that the Generations 3 and 4 Glocks comply with the *statute*."[7]  Id.

- "… facial challenges often result in premature interpretation of *statutes*, rest on speculation, are contrary to judicial restraint principles…"  Id., 7.

- "That [Williams "fair notice"] standard is less restrictive when applied to civil *statutes*…  This is especially true when statutes regulate economic or commercial activities."  Id., 9.

- "…"training" and "personnel" not unconstitutionally vague in context of *statute* prohibiting providing training to terrorist organizations…"  Id., 11.

---

[7]     The defendant ATTORNEY GENERAL is **correct** that the DEALERS "did not sue seeking a ruling that the Generations 3 and 4 Glocks comply with the **statute**."  That is because Gen3/4 Glock pistols, always listed on the Executive Office of Public Safety and Security Approved Firearms Roster, were "reviewed by the Gun Control Advisory Board and … approved by the Secretary of Public Safety and Security **as having complied with the statutory handgun testing provisions of M.G.L. c. 140, § 123**."  Emphasis in italics.  Gen 3/4 Glock pistols have always complied with the **statute** and there is nothing regarding such compliance that requires resolution here.

- "... the Attorney General requests that the Court exercise Pullman abstention and refer the matter to the State Court system for adjudication of the underlying state *law* issues in the first instance." Id., p. 22.

- "...where Court could not agree whether the *statutes* left room for state court construction, abstention was appropriate..." Id., p. 23.

The significance of the defendant ATTORNEY GENERAL's interfusion of the words "law", "statute" and "regulation" cannot be understated, as it undermines any "possibility that the state court proceeding might adequately protect the interests of the parties" (U.S. v. Fairway Capital Corp., *supra*). The defendant ATTORNEY GENERAL brings a Fifth Circuit case from 1983 and decades-old authorities to support her argument that "even when it is only possible (rather than likely or reasonably possible) that the state court can construe the state law, courts have found Pullman abstention warranted." Motion to Dismiss, p. 23, citing Reetz v. Bozanich, 397 U.S. 82, 86–87 (1970). But in Reetz the Supreme Court applied abstention to allow the Alaska state courts to interpret the "[t]he constitutional provisions relate[d] to fish resources, an asset unique in its abundance in Alaska ... the management of which is a matter of great state concern."

It is therefore no wonder why the defendant ATTORNEY GENERAL avoids bringing abundant recent and applicable authorities of which she is explicitly aware[8], that require state courts to generally defer the interpretation of an ambiguous *regulation* to the agency that promulgated it. Auer v. Robbins, 519 U.S. 452 (1997). Thus, if this Court were to exercise Pullman abstention as the defendant ATTORNEY GENERAL urges, it is expected that she would argue to the Massachusetts state court that it should exercise this so-named Auer deference doctrine and defer the interpretation of the hopelessly ambiguous "load indicator" alternative design requirement to the very same defendant ATTORNEY GENERAL who refused to interpret it [Complaint Exhibits **"23–30"**], argues that she does not have to interpret it [Motion to Dismiss, p. 14], contends that the REGULATION is clear as is [Motion to Dismiss, pp. 10-12], and who explicitly informed the PLAINTIFFS of that fact:  "Handgun dealers in Massachusetts have clear information on [how Glock

---

[8]     **Exhibit "A"** to this Opposition is a packet of materials entitled *Researching, Interpreting, Challenging, and Applying Regulations in Massachusetts* from a 24 October 2013 presentation at the Social Law Library in Boston, Massachusetts by Robert L. Quinan, Jr., Managing Attorney, Office of the Attorney General.  The presentation materials contain voluminous authorities and speak for themselves regarding judicial deference to agency interpretations of their own ambiguous regulations.

pistols do not comply with the "load indicator" alternative design requirement] from Glock, EOPSS, and this Office, and are operating on more than the 'rumor and speculation' you refer to in your letter."   [Complaint **Exhibit "28"**.]   Under the circumstances in this case, it <u>Pullman</u> abstention would open the door to the defendant ATTORNEY GENERAL manipulating the state court system to bring this crucial matter right back into her lap.

The <u>Auer</u> deference general rule of deferring to an agency's interpretation of its own ambiguous regulation does not apply in all cases.   Deference is undoubtedly inappropriate, for example, when the agency's interpretation is "'plainly erroneous or inconsistent with the regulation.'"   <u>Chase Bank USA, N.A. v. McCoy</u>, 562 U.S. __, __, 131 S.Ct. 871, 880 (2011) (internal quotes omitted).   In the instant case, "plainly erroneous" *cannot* be implicated *because the defendant ATTORNEY GENERAL has never provided **any** interpretation of "load indicator".*

Deference is likewise unwarranted when there is reason to suspect that the agency's interpretation "does not reflect the agency's fair and considered judgment on the matter in question."   <u>Auer</u>, *supra*, at 462;   *see also* <u>Chase Bank</u>, *supra*, at 881.   This might occur when the agency's interpretation conflicts with a prior interpretation, *see*, e.g., <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 515 (1994).   In the instant matter the ATTORNEY GENERAL has not provided *any* reason for her decree that Gen3/4 Glocks do not comply with the "load indicator" alternative design requirement, instantly condemning her decree to "not reflect[ing] the agency's fair and considered judgment on the matter in question."   Moreover, the defendant ATTORNEY GENERAL's singling out Gen3/4 Glock pistols as not complying with her mystery definition of "load indicator" while tacitly approving the virtually identical load indicators on other pistols (*see* Complaint at ¶¶ 68 & 69) is nothing less than the prototypical example of the very "inconsistency and conflict with a prior interpretation" discussed in <u>Thomas Jefferson Univ. v. Shalala</u>, *supra*.

Finally, the defendant ATTORNEY GENERAL argues that "the existence of a process for getting government clarifications mitigate[ ] concerns about how the law might otherwise trap an unwary dealer" and that "[h]ere, the dealers have [ ] an available process…"  Motion to Dismiss, p. 9. The DEALERS did not send their letters seeking clarification of the REGULATION to the defendant ATTORNEY GENERAL pursuant to some "available process" for "getting government clarifications".

Contrary to the defendant ATTORNEY GENERAL's assertion, no such "process" exist in the REGULATION.

Removing Auer deference for multiple reasons from the ATTORNEY GENERAL's arsenal of defenses sends the interpretation of the vague definition of "load indicator" right back to the judiciary for interpretation.  But "[c]oncurrent federal-state jurisdiction over the same controversy" is not sufficient to "lessen the federal courts' 'virtually unflagging obligation ... to exercise the jurisdiction given them.'"  Jimenez v. Rodriguez Pagan, *supra*, at 27.  This Court should retain jurisdiction of this critically important case on abundant legal authority and clear reasons of equity.

# CONCLUSION

The defendant ATTORNEY GENERAL's Motion to Dismiss fails for multiple reasons.  At its core, it argues that (1) an agency may rule by administrative fiat without having to explain how or why it came to its conclusions;  (2) that an agency need not establish or resort to any standards against which to measure regulated conduct, and (3) that as long as a constitutionally valid end is desired or achieved, unconstitutional means to achieve that end are tolerable.

On the other hand, the Complaint succeeds in clearly establishing each of the PLAINTIFFS' standing to sue, injury caused by the unconstitutionally vague REGULATION, and that redressibility is possible striking the REGULATION's definition of "load indicator" as unconstitutional.   The PLAINTIFFS respectfully ask that this Court deny the defendant ATTORNEY GENERAL's Motion to Dismiss in its entirety.

///

///

///

Respectfully submitted,

Dated:  17 September 2014.

**ROBERT DRAPER**;  **ARIEL WEISBERG;  DONNA
MAJOR**;  **ERIC NOTKIN;  ROBERTY BOUDRIE**;
**BRENT CARLTON**;  **CONCORD ARMORY, LLC**;
**PRECISION POINT ARMORY, LLC;  SECOND
AMENDMENT FOUNDATION, INC.** and
**COMMONWEALTH SECOND AMENDMENT,
INC.**

By and through their attorney of record

*/s/ Alexander A. Flig*

Alexander A. Flig, Esq (BBO #669132)
490 Chapman Street, Suite 201
Canton, Massachusetts 02021-2039
Telephone:    (781) 352-7260
Facsimile:     (781) 583-5080
E-Mail:        alex@fliglaw.com

# **CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the Electronic Case Filing (ECF) system and thus copies will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF);  paper copies will be sent to those indicated on the NEF as non-registered participants on or before 1 July 2014.

*/s/ Alexander A. Flig*