# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT DRAPER, et al., *Plaintiff*, v. MARTHA COAKLEY, in her official capacity as ATTORNEY GENERAL OF MASSACHUSETTS, *Defendant*. | Civil Action No. 1:14-cv-12471-NMG<br><br>Leave to file granted on 10/6/2014 |

## BRIEF OF *AMICUS CURIAE* BRADY CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS ALL CLAIMS

Scott Harshbarger (BBO# 224000)
John E. Roberts (*Pro Hac Vice* pending)
Laura Stafford (BBO# 685347)
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110
(617) 526-9600 (telephone)
(617) 526-9800 (facsimile)
sharshbarger@proskauer.com

*Attorneys for Amicus Curiae Brady Center to Prevent Gun Violence*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

INTEREST OF *AMICUS CURIAE*......................................................................................................2

BACKGROUND ..............................................................................................................................2

    A.    Load Indicators Inform a User that a Gun is Loaded..............................................3

    B.    Load Indicators Have Been Used for More than a Century...................................4

    C.    Load Indicators are Effective at Preventing Accidental Shootings ........................5

ARGUMENT ....................................................................................................................................9

    A.    The Second Amendment Does Not Enshrine A Right to Unsafe Guns..................9

    B.    The Challenged Regulation Does Not Implicate Second Amendment Rights ......10

    C.    The Massachusetts Load-Indicator Regulation Is Substantially Related to the Government's Interest in Protecting its Citizens. ..................................................12

CONCLUSION...............................................................................................................................14

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Am. Shooting Sports Council v. Harshbarger*,
711 N.E.2d 899 (Mass. 1999) ..................................................................................................8

*Armstrong v. United States*,
134 S. Ct. 1759 (2014) ............................................................................................................10

*Colo. Outfitters Ass'n v. Hickenlooper*,
___ F. Supp. 2d __, No. 13-cv-01300, 2014 WL 3058518 (D. Colo. June 26, 2014) ............................................................................................................................................11

*Davis v. Grimes*,
__ F. Supp. 2d ___, No. 13-cv-10246, 2014 WL 1278082 (D. Mass Mar. 26, 2014) .............................................................................................................................10, 12, 13

*Dist. of Columbia v. Heller*,
554 U.S. 570 (2008) ........................................................................................................ passim

*Fletcher v. Haas*,
851 F. Supp. 2d 287 (D. Mass. 2012) ......................................................................................9

*Heller v. Dist. of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) .............................................................................................13

*Hightower v. City of Boston*,
693 F.3d 61 (1st Cir. 2012) ......................................................................................................9

*IMS Health Inc. v. Ayotte*,
550 F.3d 42 (1st Cir. 2008) ....................................................................................................14

*Jackson v. City & Cnty. of San Francisco*,
746 F.3d 953 (9th Cir. 2014) .................................................................................................13

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) ...............................................................................................................13

*McDonald v. City of Chicago*,
130 S. Ct. 3020 (2010) .......................................................................................................9, 11

*Nat'l Treasury Emps. Union v. Von Raab*,
489 U.S. 656 (1989) ...............................................................................................................13

*Sorrell v. IMS Health Inc.*,
   131 S. Ct. 2653 (2011) ..................................................................................................14

*United States v. Armstrong*,
   706 F.3d 1 (1st Cir. 2013) ............................................................................................10

*United States v. Booker*,
   644 F.3d 12 (1st Cir. 2011) .....................................................................................10, 12

*United States v. Chovan*,
   735 F.3d 1127 (9th Cir. 2013) ......................................................................................10

*United States v. Pruess*,
   703 F.3d 242 (4th Cir. 2012) ........................................................................................10

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) (en banc) ........................................................................13

**CONSTITUTION AND STATUTES**

Cal. Penal Code §§3200 ........................................................................................................8

Cal. Penal Code §§16380 ......................................................................................................8

Cal. Penal Code §§31910 ......................................................................................................8

Mass Gen. Laws Chapter 140, § 123 ...................................................................................11

U.S. Const. Amendment 2 ............................................................................................ passim

**OTHER AUTHORITIES**

940 C.M.R. § 16.05 ...............................................................................................................7

Associated Press, *Pa. Dad Accidentally Shoots, Kills 7-year-old Son After
   Leaving Gun Store*, PennLive, Dec. 10, 2012 ...............................................................3

Bianca Cain Johnson, *Teen Charged with Involuntary Manslaughter in Fatal
   Shooting Monday*, Augusta Chronicle, Nov. 12, 2013 .................................................3

Blake Bell, *Walnut Hill Man Accidentally Killed while Cleaning Gun*, The
   Atmore Advance, June 12, 2013 ....................................................................................3

Chris Kirk & Dan Kois, *How Many People Have Been Killed by Guns Since
   Newtown?*, Slate.com, Dec. 31, 2013 ........................................................................2, 9

Ctrs. for Disease Control & Prevention, *Age-Adjusted Death Rates from
   Firearms, By State: United States*, 2010 .......................................................................8

Ctrs. for Disease Control & Prevention, *Number of Deaths from 113 Selected Causes, Enterocolitis Due to Clostridium Difficile, Drug-induced Causes, Alcohol-induced Causes, and Injury by Firearms, by Age: United States*, 2011 ...................................................................................................................... 2, 5, 6, 7

Garen J. Wintemute et al., *Unintentional Firearm Deaths in California*, 29 J. Trauma 457 (1989) ............................................................................................................ 7

Garen J. Wintemute et al., *When Children Shoot Children: 88 Unintended Deaths in California*, 257 JAMA 3107 (June 1987) ................................................................. 7

Joe Heaney & Jason B. Johnson, *Gun Tragedy Leaves Toddler Dead; Youth Accidentally Shot 2-year-old, Police Say*, Boston Herald, Mar. 22, 1996 ................. 8

Jon S. Vernick et al., *I Didn't Know the Gun Was Loaded: An Examination of Two Safety Devices that Can Reduce the Risk of Unintentional Firearm Injuries*, J. Public Health Pol'y 427, 427-40 (1999) ..................................................... 7

Jon S. Vernick, et al., *Unintentional and Undetermined Firearm Related Deaths: A Preventable Death Analysis for Three Safety Devices*, Injury Prevention 307 (2003) ............................................................................................................................. 7

Judy Rakowski, *Gun Control Urged as 2 Families Mourn*, Boston Globe, Mar. 17, 1996 ........................................................................................................................ 8

Law Ctr. to Prevent Gun Violence, *The California Model: Twenty Years of Putting Safety First* (2013) ............................................................................................ 8

Law Ctr. to Prevent Gun Violence, *Design Safety Standards Policy Summary*, Dec. 1, 2013 .................................................................................................................. 6

Law Ctr. to Protect Gun Violence, *Post-Heller Litigation Summary*, Aug. 4, 2014 ....... 9

Office of the Attorney Gen., Cal. Dep't of Justice, Roster of Handguns Certified for Sale ........................................................................................................................... 5

U.S. Patent No. 385,360 ......................................................................................................... 4

**PRELIMINARY STATEMENT**

Hundreds of Americans die each year from accidental shootings. In an effort to combat this public-health problem, the Massachusetts Attorney General in 1997 promulgated a series of common-sense regulations designed to make guns and their users safer. One of these regulations—the sole regulation challenged here—requires all guns sold by dealers in the Commonwealth to feature a load indicator, a device that alerts the user when the weapon is loaded and ready to discharge. Numerous studies have concluded that load indicators reduce accidental shootings and save lives because they prevent the unintentional shootings that occur when people misperceive a gun to be unloaded.

Although the safety benefits of load indicators cannot be denied, Plaintiffs protest that the Massachusetts regulation treads on their Second Amendment rights. Plaintiffs allege that the challenged regulation causes a single harm: Their favorite model of handgun is not available for sale in the Commonwealth because it does not have a load indicator. That alleged harm is insufficient to establish a Second Amendment violation for at least two reasons:

*First*, the Second Amendment protects only a citizen's right to keep and bear arms for self-defense, and the challenged regulation does not prevent anyone from purchasing or using a handgun for protection. Indeed, Plaintiffs admit that a panoply of handguns are available for them to purchase in Massachusetts and use for self-protection notwithstanding the challenged regulation. There is no right to unsafe or unreasonably dangerous guns. The load-indicator regulation accordingly does not impede the right to self-defense enshrined in the Second Amendment.

*Second*, even if the load-indicator regulation did implicate the Second Amendment, it is substantially related to a significant government interest. It is beyond doubt that protecting the

1

safety of its citizenry is a compelling purpose for the Commonwealth, and load indicators have proven to be an effective means of reducing accidental shootings. Consequently, the challenged regulation would easily survive any form of intermediate scrutiny.

## INTEREST OF *AMICUS CURIAE*[1]

The Brady Center to Prevent Gun Violence is a non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy. The Brady Center has a substantial interest in ensuring that gun laws are properly interpreted to allow strong government action to prevent gun violence. Through its Legal Action Project ("LAP"), the Brady Center has filed numerous *amicus curiae* briefs in cases concerning gun-violence prevention and firearms laws, including in the Massachusetts Supreme Judicial Court's gun storage case, *Jupin v. Kask*, and the U.S. Supreme Court's Second Amendment cases, *District of Columbia v. Heller* and *McDonald v. City of Chicago*. The Brady Center has also advocated for gun manufacturers to utilize safety features that could save lives, including load indicators.

## BACKGROUND

Hundreds of Americans die each year after being shot by a firearm that accidentally discharged.[2] One man in Walnut Hill, Alabama, was recently killed when his shotgun

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity other than *Amicus* made a monetary contribution to its preparation or submission.

[2] Ctrs. for Disease Control & Prevention, *Number of Deaths from 113 Selected Causes, Enterocolitis Due to Clostridium Difficile, Drug-induced Causes, Alcohol-induced Causes, and Injury by Firearms, by Age: United States*, 2011, *available at* http://www.cdc.gov/nchs/data/nvsr/nvsr63/nvsr63_03.pdf; *see also* Chris Kirk & Dan Kois, *How Many People Have Been Killed by Guns Since Newtown?*, Slate.com, Dec. 31, 2013, *available at* http://www.slate.com/articles/news_and_politics/crime/2012/12/gun_death_tally_every_american_gun_death_since_newtown_sandy_hook_shooting.htm.

accidentally discharged while he was cleaning it.[3] In Richmond County, Georgia, a teenager recently accidentally shot and killed a friend while playing with a handgun. The teenager "took the gun, removed the magazine, pointed the gun back at [the victim] and pulled the trigger. Police said [the shooter] believed the gun was unloaded."[4] In Pennsylvania, a seven-year-old boy was recently shot and killed when a handgun accidentally fired as his father was climbing into the front seat of the family's truck. His father had unloaded the magazine at home but failed to realize that a bullet was still in the chamber.[5]

It was precisely to prevent accidental shootings like these that the Massachusetts Attorney General promulgated the challenged regulation in 1997. The regulation mandates that all handguns sold in the Commonwealth contain a load indicator, a device that has been proven to reduce fatalities by accidental gunshot.

### A. Load Indicators Inform a User that a Gun is Loaded.

A load indicator, or "loaded-chamber indicator," is a device that alerts a gun user that a cartridge is in the chamber. Unlike traditional safety devices that disable a weapon from firing, a load indicator is "an appendage on the firearm that presents itself when a cartridge is loaded in the chamber or when the action is cocked." Robert E. Walker, Cartridges and Firearm

---

[3] Blake Bell, *Walnut Hill Man Accidentally Killed while Cleaning Gun*, The Atmore Advance, June 12, 2013, *available at* http://www.atmoreadvance.com/2013/06/12/walnut-hill-man-accidentally-killed-while-cleaning-gun/.

[4] Bianca Cain Johnson, *Teen Charged with Involuntary Manslaughter in Fatal Shooting Monday*, Augusta Chronicle, Nov. 12, 2013, *available at* http://chronicle.augusta.com/news/crime-courts/2013-11-12/teen-charged-involuntary-manslaughter-monday-fatal-shooting?v=1384267618.

[5] Associated Press, *Pa. Dad Accidentally Shoots, Kills 7-year-old Son After Leaving Gun Store*, PennLive, Dec. 10, 2012, *available at* http://www.pennlive.com/midstate/index.ssf/2012/12/pa_dad_accidentally_shoots_kil.html

Identification 332 (2013) ("Walker"). Its sole objective is to quickly and easily communicate to the gun holder that the weapon is loaded.

Load indicators can take many forms. For example, Ruger SR series handguns feature a tab on the top of each gun that rises when the gun is loaded. *Id.* at 333. Jimenez Arms incorporates into its pistols a red plastic knob that emerges from the rear of the slide when a magazine is loaded into the gun. *Id.* Frequently, load indicators also feature written warnings: On the Ruger SR series handgun, for instance, the load indicator tab is bright red and reads "LOADED WHEN UP." *See* Figure 1.



Fig. 1. A loaded chamber indicator on the Ruger SR9c handgun provides clear instructions to the gun handler. Source: Gunblast.com/Ruger-SR9c.htm.

### B. Load Indicators Have Been Used for More than a Century.

Load indicators have a long pedigree. The first load indicator was patented in 1888 and was described as "a simple and effective device for the purpose of indicating, without breaking the arm, the presence of a charge in the barrel or barrels" of a firearm. U.S. Patent No. 385,360 at 1:12-14; *see also* Sean Madden, Guns in American Society: An Encyclopedia of History, Politics, Culture, and the Law 515 (2012) ("Madden"). The original load indicator consisted of a

4

lever that elevated when a cartridge entered the barrel. Madden at 515. The primary purpose of the original load indicator was to improve safety: According to the patent, the load indicator provided "an effective means for the prevention of accidental discharges . . . since the person handling the arm is immediately made aware of the fact that the arm is charged by the said indicator, and therefore warned to be careful in handling the arm." US Patent No. 385,360 at 2:32-38.

Load indicators caught on quickly. Many gun models designed in the late 1800s and early 1900s had this feature, including those manufactured by Browning, Colt, Winchester, Luger, Walther, and Sauer. Walker at 333; Madden at 515. Today, hundreds, if not thousands, of gun models contain load indicators. *See* Madden at 515 (estimating that as many as 20% of all guns manufactured in the United States have load indicators); Office of the Attorney Gen., Cal. Dep't of Justice, Roster of Handguns Certified for Sale (listing hundreds of models of handguns that meet California's gun safety requisites, including its load-indicator requirement).[6]

### C. Load Indicators are Effective at Preventing Accidental Shootings.

Accidental shootings are a serious public health issue. In 2011 (the year for which the most recent government data is available), 591 Americans died as a result of the accidental discharge of a gun. Ctrs. for Disease Control & Prevention, *Number of Deaths from 113 Selected Causes, Enterocolitis Due to Clostridium Difficile, Drug-induced Causes, Alcohol-*

---

[6] http://certguns.doj.ca.gov/ (last accessed Sept. 24, 2014). As discussed below, California mandates that all semiautomatic pistols sold in the state have load indicators. *See* Background Section D, *infra*.

*induced Causes, and Injury by Firearms, by Age: United States*, *2011*.[7] Of those killed, seventy-four were children under the age of 15. *Id.*

According to a study by the U.S. Government Accountability Office, accidental shootings often occur because the user is unaware that a weapon is loaded. U.S. Gov't Accountability Office, Accidental Shootings: Many Deaths and Injuries Caused by Firearms Could Be Prevented 2 (1991) ("GAO Report"). Indeed, even the most responsible gun owner can have difficulty knowing whether there are any rounds in the chamber. For example, on guns requiring magazines, a cartridge "can remain in the chamber even after the magazine is removed, leading a person to believe the gun is unloaded." Law Ctr. to Prevent Gun Violence, *Design Safety Standards Policy Summary*, Dec. 1, 2013.[8] Moreover, a prudent gun owner might typically leave his weapon unloaded and therefore assume that it is always free of ammunition. GAO Report at 4. Furthermore, some guns are prone to "dry-firing", or failing to discharge even when the trigger has been pulled several times; when dry-firing occurs, even a prudent gun owner might assume that the chamber is empty even though it is not. *Id.* In all of these instances, a load indicator would alert a gun owner that a potentially lethal cartridge remains in the chamber.

The effectiveness of load indicators in preventing accidental deaths cannot be gainsaid. The GAO has concluded that load indicators could "save many lives and [] undoubtedly also prevent many injuries." *Id.* at 1. Indeed, nearly a quarter of the accidental firearms fatalities analyzed in the GAO study could have been prevented by a load indicator. *Id.* at 2-3.

---

[7] *Available at* http://www.cdc.gov/nchs/data/nvsr/nvsr63/nvsr63_03.pdf.

[8] *Available at* http://smartgunlaws.org/gun-design-safety-standards-policy-summary/#footnote_22_5929.

6

Extrapolating from this data, the GAO estimated that load indicators could prevent hundreds of death per year. *Id.* at 24.

The conclusions of the GAO report are borne out by more recent studies. For example, a 2003 study performed on a sample of gun deaths in Maryland and Wisconsin conducted by Johns Hopkins' Bloomberg School of Public Health came to nearly the same conclusion as the GAO report: Approximately 20% of accidental gun deaths could be prevented by the inclusion of a load indicator.[9] Similarly, two studies from the late 1980s concluded that in more than one-fifth of accidental shootings in which children were involved, the child who shot the gun was not aware that the gun was loaded.[10]

### D. Load-Indicator Regulations Have Saved Lives.

In 1997, the Massachusetts Attorney General promulgated the regulation at issue here, which requires all handguns sold in the Commonwealth to feature a load indicator. *See* 940 C.M.R. § 16.05. The load-indicator requirement was part of a larger set of regulations designed to eliminate from the Commonwealth guns that "failed to satisfy certain safety and performance requirements." *Mass. Regs Target Gun Makers, Dealers*, Massachusetts Lawyer Weekly, April

---

[9] Jon S. Vernick, et al., *Unintentional and Undetermined Firearm Related Deaths: A Preventable Death Analysis for Three Safety Devices*, Injury Prevention 307, 307-11 (2003); *see also* Jon S. Vernick et al., *I Didn't Know the Gun Was Loaded: An Examination of Two Safety Devices that Can Reduce the Risk of Unintentional Firearm Injuries*, J. Public Health Pol'y 427, 427-40 (1999).

[10] Garen J. Wintemute et al., *Unintentional Firearm Deaths in California*, 29 J. Trauma 457 (1989); Garen J. Wintemute et al., *When Children Shoot Children: 88 Unintended Deaths in California*, 257 JAMA 3107 (June 1987).

7

10, 2000.[11]  The regulations were adopted after three children were killed in accidental shootings in Massachusetts over a ten-day period in 1996; each of those shootings was attributed to a minor discharging a handgun thought to be unloaded.[12]

Massachusetts is not alone in recognizing the life-saving potential of load indicators.  In 2003, California passed legislation requiring that semiautomatic pistols have a "chamber load indicator," or a "device that plainly indicates that a cartridge is in the firing chamber."  Cal. Penal Code §§3200, 16380, 31910.  These load indicators must either be readily visible or have "incorporated or adjacent explanatory text or graphics, or both."  *Id.* § 16380.

California implemented its load-indicator requirement as part of a substantial overhaul to its gun laws. These reforms have brought real results for Californians:  Between 1993 and 2010, the state's gun death rate was cut by 56%, "a reduction that translates to thousands of lives saved every single year."  Law Ctr. to Prevent Gun Violence, *The California Model: Twenty Years of Putting Safety First*, at 4 (2013).[13]

At bottom, it is no coincidence that the two states with load-indicator laws have some of the lowest gun death rates in the country.  In fact, Massachusetts and California rank 49th and 42nd, respectively, in gun deaths, according to the Centers for Disease Control and Prevention. Ctrs. for Disease Control & Prevention, *Age-Adjusted Death Rates from Firearms, By State:*

---

[11] In a 1999 decision, the Massachusetts Supreme Judicial Court rejected arguments that the Attorney General exceeded his authority in promulgating the gun-safety regulations.  *Am. Shooting Sports Council v. Harshbarger*, 711 N.E.2d 899 (Mass. 1999).

[12] Joe Heaney & Jason B. Johnson, *Gun Tragedy Leaves Toddler Dead; Youth Accidentally Shot 2-year-old, Police Say*, Boston Herald, Mar. 22, 1996, at 1; Judy Rakowski, *Gun Control Urged as 2 Families Mourn*, Boston Globe, Mar. 17, 1996, at 76.

[13] *Available at* http://smartgunlaws.org/wp-content/uploads/2013/07/20YearsofSuccess_ForWebFINAL5.pdf.

*United States*, 2010.[14] And of the hundreds of accidental shooting deaths that occurred in 2013, only one took place in the Commonwealth.[15]

## ARGUMENT

### A. The Second Amendment Does Not Enshrine A Right to Unsafe Guns.

The Second Amendment protects a citizen's right to keep and bear arms for the limited purpose of self-defense. *Dist. of Columbia v. Heller*, 554 U.S. 570, 599 (2008); *see also* U.S. Const. amend. 2. Courts have held that the right of citizens to defend themselves from harm is the "central component" of the Second Amendment. *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3036 (2010); *Hightower v. City of Boston*, 693 F.3d 61, 72 (1st Cir. 2012) (holding that "the possession of operative firearms for use in defense of the home constitutes the 'core' of the Second Amendment"). Consequently, "laws that do not implicate the central self-defense concern of the Second Amendment may be more easily justified." *Fletcher v. Haas*, 851 F. Supp. 2d 287, 302 (D. Mass. 2012) (quoting *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010)).

The right to keep and bear arms is far from unlimited. *Heller*, 554 U.S. at 625. That is to say, the Second Amendment does not enshrine "a right to keep and carry any weapon whatsoever in any manner whatsoever for whatever purpose." *Id.* To the contrary, gun use and ownership may be restricted so long as responsible, law-abiding citizens are not effectively prevented from using a firearm to protect themselves. *See, e.g.*, Law Ctr. to Protect Gun Violence, *Post-Heller Litigation Summary* 6-13 & nn.23-75 (Aug. 4, 2014) (collecting cases and concluding that

---

[14] A*vailable at* http://www.cdc.gov/nchs/pressroom/states/FIREARMS_STATE_2010.pdf

[15] Kirk & Kois, *supra* note 1.

"nearly all" gun regulations have been upheld in the wake of *Heller*).[16] In particular, "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26.

The circuits have developed a two-step inquiry for analyzing challenges brought under the Second Amendment post-*Heller*. *See United States v. Chovan*, 735 F.3d 1127, 1136-37 (9th Cir. 2013) (collecting cases). Although the First Circuit has not explicitly endorsed this two-tiered approach, its analysis has proceeded along precisely the same lines as the other circuits, as this Court recently recognized. *See Davis v. Grimes*, __ F. Supp. 2d ___, ___, No. 13-cv-10246, 2014 WL 1278082, at * 10 (D. Mass Mar. 26, 2014).

In the first step of the Second Amendment analysis, a court must ask whether "the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *United States v. Pruess*, 703 F.3d 242, 245 (4th Cir. 2012). If the challenged law does not implicate conduct protected by the Second Amendment, it will be upheld. If, however, the law does burden Second Amendment rights, the court must proceed to apply an "appropriate form of means-end scrutiny." *Pruess*, 703 F.3d at 245; *see also United States v. Armstrong*, 706 F.3d 1, 8 (1st Cir. 2013), *vacated on other grounds*, 134 S. Ct. 1759 (2014) (applying intermediate scrutiny to law that implicated Second Amendment rights); *United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011) (same).

**B.  The Challenged Regulation Does Not Implicate Second Amendment Rights.**

As Plaintiffs concede, the regulation under attack in this litigation does not prevent Massachusetts residents from purchasing a handgun to defend themselves and their families.

---

[16] *Available at* http://issuu.com/mikemclively/docs/post-heller_litigation_summary_-_au_34aa22c4588a82?e=12582649/8920654.

Indeed, Plaintiffs in their complaint identify at least *nine different manufacturers* whose "series" of handgun models satisfy the challenged regulation and are therefore available for purchase in Massachusetts. (Compl. ¶ 69.2.) The load-indicator regulation is thus a far cry from laws that "totally ban[] handgun possession in the home," which are the only laws that the Supreme Court has found inconsistent with the Second Amendment. *Heller*, 554 U.S. at 628; *see also McDonald*, 561 U.S. at 3026 (invalidating law "effectively banning handgun possession" in Chicago).

Plaintiffs' sole alleged Second Amendment injury is that they cannot purchase *two specific models* of handguns because those models do not feature load indicators. (*E.g.*, Compl. ¶ 77.) In effect, Plaintiffs contend that the Second Amendment enshrines an absolute right to purchase the precise handgun model of one's choosing, even if it has been deemed unsafe and too dangerous for the public. But the Supreme Court has already squarely rejected that notion. *See Heller*, 554 U.S. at 625 (noting that Second Amendment does not bestow the right "to carry any weapon whatsoever"). And Plaintiffs' position moreover flies in the face of common sense: If Plaintiffs' argument carries the day, the Commonwealth would be powerless to ban the sale of a handgun that consistently failed safety testing because it, say, frequently blows up in the user's hand. *See* Mass Gen. Laws ch. 140, § 123.

At bottom, Plaintiffs and other Massachusetts residents are free to defend themselves with a variety of firearms notwithstanding the challenged regulation. The regulation therefore cannot be said to impede Plaintiffs' Second Amendment right to self-defense. *See McDonald*, 561 U.S. at 3036 (noting that the Second Amendment protects the "basic right" of self-defense). Where a law does not hinder "the general ability of a person to defend him or herself," it does not run afoul of the Second Amendment. *Colo. Outfitters Ass'n v. Hickenlooper*, ___ F. Supp.

11

2d __, ___, No. 13-cv-01300, 2014 WL 3058518, at *14 (D. Colo. June 26, 2014) (upholding law limiting magazines to 15 rounds because 15 shots is sufficient for self-defense).

Far from impeding the right to self-defense, the challenged safety regulation is no more than a rule "imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27. Under *Heller*, such regulations are "presumptively lawful." *Id.* at 627 n.26. Indeed, *Heller* explicitly stated that its holding did not preclude states from passing laws designed to make the use of guns safer. *See id.* at 632 (noting that "laws regulating the storage of firearms to prevent accidents" are likely valid).

### C. The Massachusetts Load-Indicator Regulation Is Substantially Related to the Government's Interest in Protecting its Citizens.

Even if the load-indicator regulation does somehow impede conduct protected by the Second Amendment, it passes constitutional muster because it is substantially related to a significant government interest.

First Circuit precedent does not expressly dictate the level of scrutiny that would apply if the Massachusetts load-indicator regulation were found to tread upon Second Amendment rights. In *Booker*, the First Circuit subjected to intermediate scrutiny a law that totally banned an entire subset of the population (those convicted of domestic violence) from possessing a gun. 644 F.3d at 25 (requiring "substantial relationship between the restriction and an important governmental objective"); *Grimes*, ___ F. Supp. 2d at ___, 2014 WL 1278082, at *13 (noting that *Booker* formulation is effectively intermediate scrutiny).

Certainly, the load-indicator regulation—which does not limit any citizen's ability to possess a handgun for self-defense but rather merely demands that such handguns include a particular safety feature—would not be subject to *greater* scrutiny than the law in *Booker*.

12

Indeed, other circuits uniformly apply intermediate scrutiny to laws that do not implicate the "core" Second Amendment right of self-defense in the home. *Grimes*, ___ F. Supp. 2d at ___, 2014 WL 1278082, at *13-14 (collecting cases). The challenged regulation does not trespass on this "core" right because it does not prevent any citizen from possessing a handgun at home for the purpose of self-protection. *See* Point I.A, *supra*.

Consequently, the maximum level of scrutiny that could apply to the challenged regulation is intermediate scrutiny.[17] That is, the load-indicator regulation passes muster if it is substantially related to a significant government interest. *See, e.g.*, *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1258 (D.C. Cir. 2011) ("*Heller II*"); *United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (en banc). In this case, the load-indicator regulation survives intermediate scrutiny, and it is not close.

As an initial matter, there can be little doubt that the Commonwealth has a substantial interest in protecting its citizenry from physical harm. *See, e.g.*, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994) ("The State [] has a strong interest in ensuring the public safety and order . . . ."); *see also Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 670-71, 677 (1989) (citing government's substantial interest in public safety in upholding practice of drug testing border agents who carry firearms). Indeed, "'[i]t is self-evident' that public safety is an important government interest." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 965 (9th Cir. 2014).

---

[17] Mindful of *Heller*'s admonition that rational basis review is too lenient for a law implicating Second Amendment rights, 554 U.S. at 629 n.27, we do not suggest that anything less than intermediate scrutiny would be in order.

13

Moreover, the challenged regulation is substantially related to the Commonwealth's important interest in protecting the safety of its citizens. To establish the requisite nexus between the load-indicator regulation and the public-safety interest, the Commonwealth "must demonstrate that the harms it recites are real and that [the] restriction will in fact alleviate them to a material degree." *IMS Health Inc. v. Ayotte*, 550 F.3d 42, 55 (1st Cir. 2008), *abrogated on other grounds by Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011). "A state need not go beyond the demands of common sense to show that a statute promises directly to advance an identified governmental interest." *Id.* "While empirical data must plausibly point to a conclusion, that data need not be accompanied by a surfeit of background information," and the required connection between law and government interest can be shown "based solely on history, consensus, and simple common sense." *Id.* (quotation marks and citations omitted).

Here, as explained above, extensive data supports the Attorney General's conclusion that accidental shootings are a serious public health problem. *See* Point I, *supra*. Moreover, substantial evidence demonstrates that many accidental gunshots would be prevented—and many lives saved—if every gun featured a load indicator. *See id.* Indeed, it is "common sense" that a person holding a gun will be exceedingly careful if he knows that the gun is loaded and that one wrong move could kill himself or a companion. *Ayotte*, 550 F.3d at 55. The challenged regulation therefore directly advances public safety and saves lives by ensuring that every gun owner knows when his weapon has the potential to make a fatal discharge. That is to say, the load-indicator regulation is substantially related to a substantial government interest in public safety and accordingly comports with the demands of the Second Amendment.

## CONCLUSION

For the foregoing reasons, the Court should grant the defendant's motion to dismiss.

Dated: October 3, 2014

Respectfully submitted,

*/s/ Scott Harshbarger*
Scott Harshbarger (BBO # 224000)
John E. Roberts (*Pro Hac Vice* pending)
Laura Stafford (BBO # 685347)
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110
(617) 526-9600 (telephone)
(617) 526-9800 (facsimile)
sharshbarger@proskauer.com
jroberts@proskauer.com
lstafford@proskauer.com

*Attorneys for Amicus Curiae Brady Center to Prevent Gun Violence*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2014 this document was filed through the Electronic Case Filing (ECF) system and thus copies will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Martha Coakley
Attorney General
Glenn Kaplan
Assistant Attorney General
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
Glenn.Kaplan@state.ma.us

Alexander A. Flig, Esq.
490 Chapman Street, Suite 201
Canton, MA 02021-2039
(781) 352-7260
alex@fliglaw.com

*/s/ Scott Harshbarger*
Scott Harshbarger

15